IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

```
JUDY MAXFIELD,                        )
                                      )
                  Plaintiff,          )    CIVIL ACTION
                                      )
v.                                    )    No.  05-1164
                                      )
STATE FARM MUTUAL AUTOMOBILE          )
INSURANCE COMPANY,                    )
                                      )
                  Defendant.          )
                                      )
```

**MEMORANDUM AND ORDER**

This case comes before the court on cross motions for summary judgment. (Docs. 16, 20.) The motions have been fully briefed and are ripe for decision. (Docs. 21, 23, 24, 25.) The court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e). Plaintiff's motion is DENIED and defendant's motion is GRANTED for the reasons set forth herein.

**I.  FACTS**

The following facts are either uncontroverted or designated uncontroverted.[1]  Plaintiff Judy Maxfield was employed by defendant

---

[1] Local Rule 56.1 requires the movant for summary judgment to set forth a concise statement of material facts.  D. Kan. Rule 56.1. Each fact must appear in a separately numbered paragraph and each paragraph must refer with particularity to the portion of the record upon which the movant relies.  Id.  An opposing memorandum must contain a similar statement of facts, numbering each fact in dispute, referring with particularity to those portions of the record relied and, if applicable, stating the number of the movant's fact disputed. All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted.  See Gullickson v. Southwest Airlines Pilots' Ass'n, 87 F.3d 1176, 1183 (10th Cir. 1996) (applying local rules of District of Utah).  Plaintiff did not controvert defendant's statement of facts in defendant's motion for summary judgment; therefore, all are deemed admitted.

State Farm Mutual Automobile Insurance Company ("State Farm") as an insurance agent for five years and then as a claims adjuster for twenty years.  State Farm provided a group long-term disability insurance policy for its employees through the Life Insurance Company of North America ("LINA").  State Farm delegated responsibility to LINA to act as claims administrator for the long-term disability plan ("Plan").

## A.  MEDICAL AND PROCEDURAL HISTORY

Plaintiff's medical history relevant to her claimed disability begins some sixteen years ago.  In 1989 plaintiff fell and injured her neck and back.  Consequently, Dr. Shapiro performed an anterior cervical diskectomy in 1990.  The administrative record, however, contains no pertinent medical history for plaintiff for the next seven years.  The record next notes plaintiff was diagnosed with sleep apnea on February 28, 1997, and diagnosed with fibromyalgia by Dr. David Weidensaul, a rheumatologist, in August 1997.  Also in August 1997, a second cervical diskectomy was performed by Dr. Paul Stein.  In November 1997, in follow-up, Dr. Stein noted plaintiff was complaining of "feelings of numbness in her arms," "her right leg quivers," and "losing control of bladder function . . . and a couple of accidents with bowel" but that he could not "see a reason for additional symptomatology based on the cervical spine" and concurrently referred plaintiff to a psychologist, Dr. Moeller, who diagnosed plaintiff with "major depression, recurrent (and in partial remission)." Plaintiff's employment with State Farm ended August 27, 1997.

On December 15, 1997, Dr. Babikian, a neurologist, examined plaintiff and reported "[t]he patient has multiple complaints without

-2-

any objective findings on exam." Also on December 15, 1997, plaintiff was again evaluated by Dr. Stein who reviewed the reports of Drs. Moeller and Babikian and then stated:

> From the point of view of her surgery itself I think she could be released to return to work but she does not feel that she could do her work again given the continued symptoms in her hands. I am going to refer her to a physiatrist for evaluation and any further therapy and ultimately I will leave it up to the physiatrist to do functional capacities assessment and make any kind of rating in release.

Plaintiff again saw Dr. Babikian on December 29, 1997 at which point Dr. Babikian concluded "from a neurological standpoint . . . I am unable to find anything specific to treat." Plaintiff then saw Dr. Blake Veenis, the physiatrist to whom she had been referred by Dr. Stein, on January 6, 1998. Dr. Veenis discussed plaintiff's symptoms and their possible causes and then stated:

> With regards to Ms. Maxfield returning to work, at this point in time I feel she could do some sedentary work without a lot of repetitive upper extremity activities and I have recommended restricting repetitive upper extremity activities to no more than occasional . . . With the job she has described to me . . . I have a lot of reservations about whether she will be able to do this job because she states it is almost all data entry into the computer and I'm not sure that her upper extremities will be able to tolerate this. Thus, I have recommended she return to work with the restrictions as listed above.

Dr. Veenis had been informed by plaintiff that the job she would be returning to was a "new job . . . doing computer documentation of data as well as phone work" rather than her old job of claims adjuster.

Shortly thereafter, plaintiff saw Dr. Weidensaul, her rheumatologist, who noted her previous diagnosis of fibromyalgia but also indicated to plaintiff not all her symptoms could be explained by a rheumatology diagnosis. Dr Weidensaul made no mention of

-3-

plaintiff's work abilities.

On January 21, 1998, plaintiff first applied for disability benefits with LINA.  Plaintiff's application referenced her previous neck surgery and "numb fingers on both hands & both arms dysfunctional.  Rt. leg spasms & jerks & painful."  LINA initially denied plaintiff's claim for disability benefits, as of July 20, 1998.[2]

On January 26, 1998, plaintiff again saw her rheumatologist, Dr. Weidensaul.  At that time Dr. Weidensaul told plaintiff "she probably cannot do the type of work she was doing with the computer before." On February 10, 1998, plaintiff again saw Dr. Veenis, who then stated that plaintiff "is not employable in the competitive work environment" but "may be able to do some sedentary activities."  Dr. Veenis also stated he "did not feel that she will be able to return to her previous work."  Dr. Veenis concluded plaintiff was "disabled by the combined effects of her cervical myelopathy, fibromyalgia and depression with histrionic traits."  On April 14, 1998 and June 5, 1998, Dr. Veenis reaffirmed his February diagnoses and his belief that

---

[2] Throughout 1998 and 1999 plaintiff sought social security disability benefits.  On March 5, 1998, plaintiff's application was denied by the Social Security Administration.  Plaintiff was later awarded social security disability benefits on January 4, 1999, with an effective date of August 26, 1997.  Plaintiff believes the Social Security Administration's determination should have some weight on LINA's determination.  To the contrary, a social security disability determination does not compel the same determination from a plan administrator.  See Wagner-Harding v. Farmland Indus. Inc. Employee Ret. Plan, No. 01-3085, 2001 WL 1564041, at *6 (10th Cir. Dec. 10, 2001) (holding that workers' compensation and social security administration determinations do not compel a plan administrator to automatically grant benefits because the proceedings are "entirely different and separate from a claim under ERISA, with different parties, different evidentiary standards, and different bodies of law governing their outcomes").

plaintiff would permanently be unable to return to work.[3]

Plaintiff was next seen by Dr. Weidensaul on September 10, 1998 at which time Dr. Weidensaul stated that plaintiff was "not able to work at this point" and that he "did not think she will be able to work again in the foreseeable future." In October 1998, plaintiff was seen by her primary care physician, Dr. Thode. Dr Thode stated plaintiff was "unable to walk greater than one block and cannot stand for more than five minutes, nor can she sit for more than five minutes because of pain across her neck and back" and concluded that "patient is unable to work at this point." Also in October 1998, plaintiff underwent breast reduction surgery in attempt to alleviate her chronic neck pain and fibromyalgia. On November 11, 1998, Dr. Thode noted that plaintiff thought the reduction surgery had helped quite a bit.

In January, February, and March 1999, plaintiff saw her psychiatrist, Dr. Hohly, but no discussion or conclusions were transcribed regarding plaintiff's work ability. At this point, on May 12, 1999, LINA reversed its decision and granted disability benefits to plaintiff.

Six months later, in November 1999, plaintiff spoke with Dr. William Hague of MCC Behavioral Care at the request of LINA. Dr. Hague conducted a telephone interview with plaintiff and reviewed her medical records. Due to "conflicting data" provided by plaintiff and the fact that she had not seen her family physician or rheumatologist

---

[3] As noted above, at the time of his January 1998 assessment, Dr. Veenis understood the job Maxfield would be returning to at State Farm to be a data entry position, rather than her previous position of claims adjuster. Dr. Veenis did not document in his subsequent assessments whether he continued to rely on this mistaken belief.

since the beginning of 1999, Dr. Hague believed an independent medical examination would be helpful. Dr. Hague concluded that "unless modifications are made in the use of treatment interventions being offered . . . it would seem unlikely that she will return to work on any kind of timely basis." On November 16, 1999, plaintiff saw Dr. Thode, her family physician, with a complaint of chronic pain.

On January 17, 2000, plaintiff again saw Dr. Thode who stated that plaintiff reported her neck pain seemed to be better. On January 19, 2000, plaintiff was sent by LINA to Prairie View, Inc. for an independent psychiatric examination by Dr. Vernon Yoder. Dr. Yoder concluded: "She has not reached maximum medical improvement and would probably benefit from some sort of part-time, light employment, if it were available, but it may not be. . . . It is not clear when she would be able to return to work on a full time basis, if ever."

On March 7, 2000, Dr. Weidensaul recorded the following office note:

> This patient presented today to have some insurance papers filled out for Signa [sic] Insurance for disability. The patient relates that she still has a lot of problems with balance, muscle pain, fatigue, problems with concentration, head tremors, hand tremors, and also a lot of problem with muscle cramping. The patient did not feel that she would be able to hold down any gainful employment because of these various problems.

Dr. Weidensaul went on to relate a "brief exam" that noted no objective observations other than that "[t]he patient does have the head and hand tremors as mentioned." Dr. Weidensaul concluded:

> The patient still seems to have a lot of general health problems. I do not see any evidence today for an inflammatory arthritic condition or muscle inflammation problem. She has been taking several medications from Dr. Thode, who also told her that she should also have a 5 pound weight limit on lifting because of chronic neck pain.

-6-

> I did refer further questions regarding her current health status back to Dr. Thode's office.

Dr. Weidensaul then reported to LINA that plaintiff's physical abilities included a two hour sitting capability, "current weight limit of 5 pounds for neck problems," "very poor balance," and that plaintiff "drops things secondary to her numbness."

At the request of LINA, on May 2 and 4, 2000, plaintiff underwent a functional capacity evaluation (FCE) to determine her potential work ability. The examiner made detailed findings of plaintiff's ability to lift, sit, stand, and walk during this two-day examination and concluded that plaintiff could hold a job at the light physical demand level. Specifically, the FCE examiner concluded plaintiff could sit six hours, stand seven hours, and/or walk five hours out of an eight hour day; lift or carry ten pounds frequently and eleven to twenty pounds occasionally; and use her hands for manipulation frequently.[4]

On June 15, 2000, LINA advised plaintiff it was terminating her disability benefits because plaintiff no longer met the Plan's definition of disabled. Plaintiff received benefits from LINA from June 12, 1998 through June 11, 2000. LINA based its termination on the functional capacity examination, a vocational assessment, and plaintiff's medical documentation. LINA concluded that plaintiff

---

[4] The parties agree that an FCE is an objective test designed to measure an individual's work ability. The parties disagree, however, on the weight that should be given to the conclusions of the FCE. Plaintiff contends that she was told to "disregard any weight limitations" and give her "absolute maximal effort" in taking the test and thus the FCE is not an accurate depiction of her true work ability. Defendant responds that the instructions given to plaintiff per the FCE evaluation were "to select weights . . that she felt she could lift or carry without significant aggravation of her pain" and "to make as many adjustments to the weights as was necessary to determine the maximal weight she was able to comfortably tolerate."

"retain[ed] the capacity to perform any occupation including that of your prior occupation."

On July 21, 2000, plaintiff notified LINA that she wished to appeal the denial of disability benefits.  As part of her appeal, plaintiff submitted a June 19, 2000 letter from Dr. Thode.  In his letter, Dr. Thode commented on the FCE and stated "he believes his October 1998 letter [with 5 minute walking and sitting limitations] to still be true" and that "what you have seen under the functional capacities evaluation is indeed a maximal effort that cannot be sustained and most likely over-represents her ability to consistently perform at a job."

On August 14, 2000, Dr. Smith, a rheumatologist, performed a review of plaintiff's records at the request of LINA.  Dr. Smith's report noted that persons with fibromyalgia "can be expected to function normally" and "based on the functional capacity evaluation . . . Maxfield is physically able to work at a job requiring light duty."  However, Dr. Smith also noted that "Dr. Yoder is concerned her ability to work full-time may be limited by her psychiatric problems" and he could not "assess her level of function from the psychiatric standpoint."

On September 25, 2000, LINA denied plaintiff's appeal.  On October 20, 2000, plaintiff filed a written second appeal.  LINA invited plaintiff to submit further documentation with her appeal but plaintiff did not do so.  On December 12, 2000, LINA reaffirmed its prior denial and notified plaintiff she had exhausted her administrative remedies.

-8-

**B.   LONG-TERM DISABILITY PLAN**

With the above lengthy recitation of the medical and procedural history of this case, the court now turns to the long-term disability plan at issue.  The Plan provides:

> The Plan Administrator and The Life Insurance Company of North America shall have the power to make all reasonable rules and regulations required in the administration of the Plan and for the conduct of its affairs, to make all determinations that the Plan requires for its administration, and to construe and interpret the Plan whenever necessary to carry out its intent and purpose and to facilitate its administration.  All such rules, regulations, determinations, constructions, and interpretations made by the Plan Administrator and The Life Insurance Company of North America shall be binding upon the Policyholder . . . and all other interested parties.
>
> Under the terms of the Plan, "disability" is defined as follows:
>
> An Employee will be considered Disabled if because of Injury or Sickness, he is unable to perform all the essential duties of his occupation.
>
> After Monthly Benefits have been payable for 24 months, an Employee will be considered Disabled only if he cannot actively work in any 'substantially gainful occupation' for which he is qualified or may reasonably become qualified by reason of his education, training or experience.
>
> 'Substantially gainful occupation' means one which provides the income required to support the standard of living reasonably approximating the standard maintained prior to the disability.

Plaintiff argues she meets the definition of long-term disability under the terms of the Plan and that defendant's decision denying her benefits was arbitrary and capricious.  Defendant responds that there was substantial evidence supporting its decision to deny benefits under the Plan's "any occupation" definition of disability.

**II.   SUMMARY JUDGMENT STANDARD**

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined

-9-

here.  Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  If so, the court cannot grant summary judgment.[5] Prenalta Corp. v. Colo. Interstate Gas Co., 944 F.2d 677, 684 (10th Cir. 1991).

## III.  STANDARD OF REVIEW

Both parties agree their dispute is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.  (Docs. 21 at 1; 16 at 1.)  Plaintiff is seeking long-term disability benefits under an employee-sponsored benefit plan and the

---

[5] Even though the parties have filed cross-motions for summary judgment, the legal standard does not change. See United Wats, Inc. v. Cincinnati Ins. Co., 971 F. Supp. 1375, 1382 (D. Kan. 1997).  It remains this court's sole objective to discern whether there are any disputes of material fact, see Harrison W. Corp. v. Gulf Oil Co., 662 F.2d 690, 692 (10th Cir. 1981), and the court will treat each motion separately.  See Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000).

claim is thus governed by ERISA § 1132(a)(1)(B). "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a <u>de novo</u> standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989). If the benefit plan gives the administrator or fiduciary that authority, the court must then judge the denial of benefits according to an arbitrary and capricious standard. <u>See</u> <u>Kimber v. Thiokol Corp.</u>, 196 F.3d 1092, 1097 (10th Cir. 1999).

There is no dispute that here the Plan expressly gives the plan administrator binding discretion to determine whether to deny a claimant insurance benefits under the Plan. (Docs. 21 at 10; 18 at 15.) Thus, the court will review LINA's decision denying plaintiff long-term disability benefits using the arbitrary and capricious standard. The Tenth Circuit has explained the arbitrary and capricious standard in detail.

> In determining whether the administrator's decision was arbitrary or capricious, we look to various indicia, including: (1) whether substantial evidence supported the administrator's decision; (2) whether the administrator based its decision on a mistake of law; and (3) whether the administrator conducted its review in bad faith, or under a conflict of interest. To survive our review, the Administrator's decision need not be the only logical one nor even the best one. The reviewing court need only assure that the administrator's decision falls somewhere on a continuum of reasonableness–even if on the low end. In other words, we will uphold the administrator's decision unless it is not grounded on any reasonable basis.

<u>Roach v. Prudential Ins. Brokerage, Inc.</u>, No 02-4042, 2003 WL 1880641, at *4 (10th Cir. Apr. 16, 2003) (quotations omitted). In reviewing an ERISA plan administrator's decision under the arbitrary and

-11-

capricious standard, federal courts are limited to the administrative record-"the materials compiled by the administrator in the course of making his decision." Hall v. UNUM Life Ins. Co. of Am., 300 F.3d 1197, 1201 (10th Cir. 2002).

Because the Plan grants defendant binding discretionary authority, the court must apply the arbitrary and capricious standard to the plan administrator's actions. However, the Tenth Circuit affirmed a modification to this standard with the use of the "sliding scale" approach upon finding a conflict of interest. In Chambers v. Family Health Plan Corp., 100 F.3d 818, 826 (10th Cir. 1996), the Tenth Circuit held that "the fiduciary decision will be entitled to some deference, but his deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." Chambers, 100 F.3d at 826 (quotation omitted). The Tenth Circuit expanded on Chambers in Fought v. UNUM Life Ins. Co., 379 F.3d 997 (10th Cir. 2004). When the plan administrator is also acting as the plan's third-party insurer, an inherent conflict of interest arises and the burden is placed on the plan administrator to demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence. Fought, 379 F.3d at 1006.

Here, there is also no dispute regarding the level of deference to be accorded to the plan administrator. (Docs. 21 at 10; 18 at 17-18.) LINA was acting as both plan administrator and as the third-party insurer. Thus, defendant bears the burden of showing its decision was based on substantial evidence. The phrase "substantial evidence" has been expressly defined by the Tenth Circuit.

"Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker]. Substantial evidence requires more than a scintilla but less than a preponderance." Sandoval v. Aetna Life and Cas. Ins. Co., 967 F.2d 377, 381 (10th Cir. 1992) (internal quotations and citations omitted).

**IV. ANALYSIS**

The issue is whether there is substantial evidence plaintiff met the Plan definition of "disabled" when her disability benefits were denied. It is undisputed that plaintiff was disabled for 24 months, from June 12, 1998, through June 11, 2000, the "own occupation" period of coverage under the Plan. The central issue is whether plaintiff met the "any occupation" definition of disability under the Plan as of June 11, 2000, when her benefits were terminated.

LINA received determinations of plaintiff's ability to work from four physicians and based its denial, in part, on the opinions of these four; Drs. Thode, Weidensaul, Yoder, and Smith. Dr. Thode, plaintiff's family physician, believed plaintiff was unable to work and consistently expressed this opinion from 1998 through 2000. Plaintiff believes LINA should have given special weight to the opinion of Dr. Thode, as the physician with the most familiarity with her medical conditions and work ability. Dr. Thode's assessment of plaintiff's work ability does place her well within the Plan's definition of "any occupation" disability - Dr. Thode wrote LINA that the FCE performed by plaintiff over-represented her ability to consistently perform at a job and affirmed his belief that plaintiff was unable to work. An ERISA plan administrator, however, is not

-13-

required to give special deference to the opinion of a treating physician.  See Black & Decker Disability Plan v. Nord, 523 U.S. 822, 834 (2003).  In Black & Decker, the Supreme Court stated:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.  But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

Id.  Dr. Thode's opinion concerning plaintiff's work ability and the lack of weight he gave the FCE was but one piece of evidence of plaintiff's work ability.  As stated in its denial of plaintiff's appeal, LINA considered Dr. Thode's opinion before denying plaintiff's appeal, but ultimately rejected it because Dr. Thode "provided no medical information to support his opinion."[6]

Dr. Weidensaul, who at times was actively treating plaintiff, either expressed no opinion on plaintiff's ability to work or expressed the opinion that plaintiff was able to work but only with limitations.  When asked by LINA whether he agreed with the results of the FCE, however, Dr. Weidensaul noted that based on the FCE and plaintiff's previous occupation of claims adjuster, plaintiff "could seek employment again."  Dr. Weidensaul did state that he was not

---

[6] Dr. Thode continued to adhere to the five minute sitting and standing restrictions stated in his 1998 letter despite their apparent severity.  As defendant points out, with such severe restrictions, plaintiff would not only be unable to sit in a car long enough to travel the distance from her home in Hutchinson, Kansas to Wichita for appointments with other physicians, but would also be unable to cook, clean, or perform most activities of daily living.  Plaintiff's records show no evidence of inability to perform everyday activities and Dr. Thode certainly did not support his restrictions with any evidence of the same.

-14-

plaintiff's family doctor and that there may be other factors complicating her health status and he concluded only with the opinion that he was unaware of any reason plaintiff could not perform as the FCE indicated.

Drs. Yoder and Smith were hired by LINA as independent medical examiners. Dr. Smith, a rheumatologist, opined that based on the diagnosis of fibromyalgia, plaintiff should not be limited from working. However, Dr. Smith's opinion was basically inconclusive as he stated that he could not fully assess the interplay of plaintiff's psychiatric diagnoses with her medical diagnoses. Dr. Yoder opined plaintiff would benefit from part-time, light employment but that it was unclear to him when plaintiff could resume full-time work. LINA responds, however, that Dr. Yoder's conclusions do not appear to be based on objective findings, but rather build on subjective reporting from plaintiff.

LINA also based its denial of long-term disability benefits on the results of the FCE. Collectively, plaintiff's medical records show a lack of objective evidence of plaintiff's ability or inability to work. Indeed, plaintiff has pointed to no objective evidence of her work ability, only her physicians' beliefs based on plaintiff's subjective description of her symptoms, some opinions being two years old at the time LINA made its determination.[7] Therefore, the FCE was

---

[7] For example, plaintiff relies on the opinion of Dr. Veenis, the physiatrist who last evaluated plaintiff in June 1998. At that time, Dr. Veenis concluded plaintiff would permanently be unable to return to work. However, at the time LINA made its denial of plaintiff's claim, Dr. Veenis' conclusion was two years old. In the interim, plaintiff had undergone breast reduction surgery with the goal of alleviating her neck pain and LINA had newer information upon which it could rely.

the primary objective measurement on which LINA could rely to base a disability determination. Dr. Thode believed LINA should not rely on the FCE, but Drs. Smith and Weidensaul believed LINA could rely on the FCE's determination. The FCE was an objective, two-day examination of plaintiff's actual ability to lift, sit, stand, and walk. The FCE determined plaintiff could sit six hours, stand seven hours, and/or walk five hours out of an eight hour day; lift or carry ten pounds frequently and eleven to twenty pounds occasionally; and use her hands for manipulation frequently. The FCE examiner concluded plaintiff could hold a job at the light physical demand level. Thus, LINA's decision denying disability benefits is based on "more than a scintilla but less than a preponderance" of evidence, which is all that is required.

LINA's interpretation of the Plan's terms was also reasonable. LINA tied its denial of long-term disability benefits to the Plan definition of disability, which required that plaintiff be unable to work in "any 'substantially gainful occupation' for which [she] is qualified or may reasonably become qualified." The FCE's objective conclusions of plaintiff's work ability and the lack of objective evidence for any contrary conclusion supports LINA's determination that plaintiff did not meet the Plan definition of disabled. LINA denied plaintiff benefits based on the objective evidence before it that plaintiff only subjectively refuted.

Plaintiff argues that under the Plan's definition of "any occupation" disability, she "would be considered disabled if she was unable to be gainfully employed at a job that would pay her something in excess of $60,000.00 per year" based on previous earnings of

-16-

$5,096.40 per month at State Farm. Plaintiff goes on to state that "no employer would offer to hire her under those terms or, for that matter, at all." Plaintiff not only does not support her factual assertions by citations to the record, she also does not support her argument by any evidence that she could not find an occupation sufficient to support her pre-disability standard of living. The definition of "any occupation" disability does not require that the claimant be able to work at an occupation paying the exact income enjoyed pre-disability. Rather, the definition requires only that a claimant be able to work at an occupation that provides income "required to support the standard of living reasonably approximating the standard maintained prior to the disability." At LINA's request, a certified rehabilitation counselor performed a vocational assessment in May 2000, and concluded, based on plaintiff's transferable skills, that plaintiff was capable of performing her own previous occupation of claims adjuster. This would certainly place plaintiff within the Plan definition of working at an occupation providing income to support her pre-disability standard of living.

Plaintiff spends a great deal of time in her motion for summary judgment, and does so exclusively in her response to defendant's motion, listing the "constellation of health problems" she is currently suffering and then stating the conclusion that "given her myriad health problems, the evidence is clear that the administrator was arbitrary and capricious in cutting off her disability benefits." Plaintiff in no way ties her argument to the language of the Plan. The Plan's language and definitions of disability control, not whether or not plaintiff was ill or suffered from various health problems.

-17-

Plaintiff's claim for disability in January 1998 was based on cervical spine issues and fibromyalgia. The "constellation of health problems" plaintiff is fond of listing are not material to her claim for disability. Those ailments were not before the plan administrator when its decision was made and will not now be considered.

**V.  CONCLUSION**

Under the applicable standard of review, LINA's decision need not be the only logical conclusion, nor even the best conclusion. LINA's decision need only be supported by substantial evidence to counter a claim that it was arbitrary or capricious. LINA has met this standard and its motion for summary judgment (Doc. 16) is GRANTED. Accordingly, plaintiff's motion for summary judgment (Doc. 20) is DENIED.

IT IS SO ORDERED.

Dated this  12th   day of September 2006, at Wichita, Kansas.

> S/ Monti Belot
> Monti L. Belot
> UNITED STATES DISTRICT JUDGE